EXHIBIT A

**UNITED STATES OF AMERICA**
**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
**OFFICE OF HEARINGS AND APPEALS**

|  |  |
|---|---|
| **In the Matter of:**<br><br>Millennia Housing Management, Ltd.,<br>*et al.*<br><br>**Respondents.** | **24-JM-0150-CM-005;**<br>**24-AF-0151-CM-006;**<br>**24-AF-0171-CM-008;**<br>**24-AF-0172-CM-009;**<br>**24-AF-0173-CM-010;**<br>**24-AF-0181-CM-011;**<br>**24-AF-0182-CM-012;**<br>**24-AF-0186-CM-013;**<br>**24-AF-0187-CM-014;**<br>**24-AF-0188-CM-015;**<br>**24-AF-0189-CM-016;**<br>**24-AF-0194-CM-017;**<br>**24-AF-0215-CM-018;**<br>**24-AF-0216-CM-019;**<br>**24-AF-0223-CM-020;**<br>**24-AF-0224-CM-021.** |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS ................................................................................... 2

    I.    Program Background ............................................................................... 2

    II.    Respondents and Their Projects ............................................................. 4

    III.    The Investigation ................................................................................... 6

    IV.    HUD's Response .................................................................................... 7

    V.    Procedural History ................................................................................. 9

    VI.    The Unauthorized Distributions ........................................................... 10

ARGUMENT ..................................................................................................... 12

    I.    Respondents knowingly and materially violated the statute by paying out more than $3 million in project funds without HUD authorization. ......................................................... 13

        A.    HUD may impose penalties for unauthorized distributions of project funds by these Respondents. ...................................................................................... 13

        B.    Respondents made 115 distributions of project funds without HUD approval. ........... 17

        C.    Respondents knowingly violated HUD requirements ................................................. 21

        D.    Respondents' violations of HUD requirements were material. ................................... 25

    II.    When one of the country's largest providers of affordable housing routinely flouts HUD's rules to unlawfully remove more than $3 million from project funds, the penalty should be substantial. ............................................................................................................. 28

        A.    The Gravity of the Offense ........................................................................................ 28

        B.    The Degree of the Violator's Culpability ................................................................. 29

        C.    Benefits Received by the Violators and Others ......................................................... 32

        D.    Deterrence of Future Violations .................................................................................. 35

        E.    Injury to Tenants and to the Public ........................................................................... 38

        F.    History of Prior Offenses ........................................................................................... 40

        G.    Ability to Pay ............................................................................................................. 41

CONCLUSION ................................................................................................... 42

## INTRODUCTION

Under HUD's civil money penalty statute, the borrower of a multifamily mortgage insured by the Federal Housing Administration ("FHA") cannot pay out any funds from the mortgaged property, except for reasonable operating expenses and necessary repairs or surplus cash, without HUD's prior written approval. This policy, echoed in HUD regulations and in contracts signed by each borrower as part of their mortgage, helps ensure that the mortgaged property has sufficient capital to pay its bills and avoid default, thus protecting the FHA insurance fund and the property's tenants.

Respondents here own or manage sixteen multifamily housing projects with FHA-insured mortgages. Respondents admit that they paid out project funds without HUD approval, for purposes unrelated to the project, a total of 115 times. Further, Respondents admit that most of these payments went directly to Respondent Frank Sinito, the ultimate owner who exercised effective control over each Respondent entity; the remainder appear to have been used for his benefit. But regardless of the destination, each of these transfers was knowing and deliberate, and violated HUD program requirements, imposing risk on the FHA insurance fund that it did not agree to bear. There is no dispute as to these material facts, which conclusively establish Respondents' liability for a civil money penalty for each transaction. Indeed, Respondents have agreed not to introduce any evidence of their own concerning these facts. (*See* Joint Stipulation to Limit Discovery and Evidence (Apr. 10, 2025) ("Joint Stip.").)

The 115 unlawful and unauthorized distributions alleged here represent a serious breach of the trust that HUD and FHA placed in Respondents, which are part of the Millennia Companies corporate family, one of the largest owners of affordable multifamily housing in the United States and a major participant in HUD/FHA programs. Worse, all indications suggest that

this sort of transaction was the rule, not the exception, for Respondents; these violations are merely the tip of a much larger iceberg of financial malfeasance that threatens the FHA insurance fund. But for now, these 115 violations are before the Tribunal, the facts are effectively conceded, and HUD seeks to impose significant penalties for this repeated and egregious conduct.

## STATEMENT OF FACTS

The Government has filed its Statement of Undisputed Material Facts ("SUMF") concurrently with this Motion and incorporates it by reference here. Because that Statement provides detailed information about 16 properties, dozens of entities, and more than 100 transactions, the Government also provides this abridged summary of pertinent facts to aid in understanding the case as a whole.

### I.    PROGRAM BACKGROUND

Respondents own and operate the sixteen affordable multifamily housing communities involved in this matter (the "Projects"), all of which, at all times relevant here, were subject to mortgages insured by the FHA, a component of HUD. (SUMF ¶¶ 11, 20, 30, 38, 46, 54, 63, 72, 80, 88, 98, 108, 116, 125, 133, 141.) By insuring lenders against the risk of loss from mortgage defaults, FHA programs increase the amount of capital available to borrowers ("mortgagors") to build, rehabilitate, purchase, and refinance multifamily rental housing, with more favorable interest rates and other terms than would otherwise be available.[1] As a result, FHA-insured loans "can encourage investment in higher-risk properties in underserved areas," in part "by reducing developers' financing costs and assuming some or all of the interest rate risks that otherwise would be borne by lenders." Darryl E. Getter, *Multifamily Housing Finance and Selected Policy*

---

[1] (*See, e.g.,* Iber Decl. ¶ 7.)

2

*Issues*, Cong. Res. Serv. Report R46480 (Mar. 8, 2023) at 10, *available at* https://crsreports.congress.gov/product/pdf/R/R46480. These mortgages "can help sustain profitability of various multifamily projects that otherwise might be bypassed due to the higher financing costs." *Id*. Many of these projects might not be underwritten at all without FHA backing. (Iber Decl. ¶ 7.)

In exchange for this financing, the mortgagor must execute a Regulatory Agreement and potentially other contracts with HUD, subjecting the mortgagor and the project to certain conditions and requirements. (*Id.* ¶ 9.) Statute and regulation define many specific terms of those agreements and impose additional requirements on program participants beyond the four corners of the contracts. The purpose of these requirements is twofold: to safeguard the FHA's insurance fund by minimizing default risk, which would require FHA to pay a claim to the lender; and to protect tenants from unsafe or unsanitary conditions. (*Id.*) HUD's Office of Multifamily Housing oversees the program and its participants. (*Id.*)

Among other things, these statutes, regulations, and contracts limit the distribution of profits from the mortgaged property. (*Id.* ¶ 10.) Generally, mortgagors can take distributions from the project once or twice a year, depending on the terms of their Regulatory Agreement. (*Id.*) To take a distribution, the mortgagor must first calculate its "surplus cash," which is also defined by the project's Regulatory Agreement. (*Id.*) Any distribution of profits must be made from the project's calculated surplus cash. (*Id.*) All other distributions or withdrawals of funds must be taken to satisfy the project's reasonable operating expenses. (*Id*.)

To ensure compliance, HUD is authorized by statute to impose civil money penalties for knowing and material violations of certain program requirements. 12 U.S.C. § 1735f-15(c)(1)(B). Relevant here, violators can be sanctioned for knowingly and materially engaging in

the "[a]ssignment, transfer, disposition, or encumbrance of any personal property of the project, including rents, other revenues, or contract rights, or paying out any funds, except for reasonable operating expenses and necessary repairs, without the prior written approval of the Secretary." *Id*. § 1735f-15(c)(1)(B)(ii). Paying out "surplus cash, as defined by and provided for in the regulatory agreement," does not constitute a violation. *Id.*

In the event of a violation, penalties may be imposed not just against the mortgagor of the FHA-insured loan, but also against certain related parties that own or control the mortgagor, like its general partner, including any members of a limited liability company that serves as the general partner. *Id.* § 1735f-15(c)(1)(A). Liability also extends to an agent employed to manage the property that has an identity of interest with one of those persons or entities, known as an "identity of interest agent." *Id*. For the purposes of this statute, an "identity of interest agent" is defined as an entity with "management responsibility for a project[,] in which the ownership entity, including its general partner or partners (if applicable) and its officers or directors (if applicable), has an ownership interest[,] and over which the ownership entity exerts effective control." *Id.* § 1735f-15(k).

## II.    RESPONDENTS AND THEIR PROJECTS

Respondent Millennia Housing Management, Ltd. ("Millennia") provides property management services for more than 30,000 units of multifamily housing. *Property Management - The Millennia Companies*, https://themillenniacompanies.com/what-we-do-2/property-management/ (last visited Apr. 24, 2025). It is one component of The Millennia Companies, a corporate family of related businesses primarily in the real estate sector, which includes other affiliated entities like Millennia Housing Development, Ltd., and Millennia Housing Capital, Ltd. *See Frank T. Sinito - The Millennia Companies*, https://themillenniacompanies.com/frank-t-sinito/ (last visited Apr. 24, 2025). Respondent Frank Sinito is the founder and CEO of The

4

Millennia Companies. *Id*. Additionally, Sinito is a member of Millennia Housing Management, Ltd. and serves as its CEO. (SUMF ¶ 9.)

The Sinito/Millennia Companies umbrella encompasses numerous property-specific entities, including all but two of the Respondents in this case.[2] (*Id.* ¶ 10.) Each of the sixteen Projects at issue here has a roughly similar ownership structure. Each is owned by a mortgagor entity, typically a limited partnership named after its respective Project's current or former name, with "LP" or "Ltd." appended at the end.[3] (*Id.* ¶¶ 12, 21, 31, 39, 47, 64, 73, 81, 89, 99, 109, 117, 126, 134, 142.) The mortgagor entity has as a general partner a limited liability company named after the Project's current or former name, usually with "Investment LLC" appended. (*Id.* ¶¶ 14, 26, 33, 41, 49, 66, 75, 83, 93, 102, 111, 119, 128, 136, 144.) Sinito is generally the sole member of each Investment LLC.[4] (*Id.* ¶¶ 15, 25, 34, 42, 58-59, 67, 76, 84, 94, 104, 112, 120, 129, 137, 145.) Other entities may also have interests in the mortgagor, typically as limited partners. (*See generally* Ex. 1 at No. 2.) The following diagram illustrates the basic project ownership structure:

---

[2] There is no evidence that Sinito holds an ownership interest in YMHA Housing Preservation, LLC or Trail West Housing Partners, Inc.

[3] Three of these limited partnerships are named "[Project] Limited Dividend Housing Association Limited Partnership" under a provision of Michigan law.

[4] Three Projects—Hunter's Run and each of the two Oakdale Estates properties—formally structure their ownership entities slightly differently, but they embody a similar approach. Each of these Projects is owned by a limited liability company rather than a partnership, but ultimately with Frank Sinito as the principal owner. (SUMF ¶¶ 55-59, 89-94, 99-104.)



Each Project has retained Millennia as its management agent, under a contract approved by HUD, which identifies Millennia as an "identity of interest agent" because both Millennia and each ownership entity are at least partially owned, and effectively controlled, by Sinito. (*See* SUMF ¶¶ 16, 27, 35, 43, 51, 60, 69, 77, 85, 95, 105, 113, 121, 130, 138, 146).

## III.    THE INVESTIGATION

The distributions at issue in this matter first came to light because of an incident at a Millennia-managed, but not Sinito-owned, property in Michigan. The Brookwood Gardens property in Clare, Michigan, received HUD funds from a Housing Assistance Payments ("HAP") contract to subsidize its tenants' rents, while its mortgage was insured under a program operated by the U.S. Department of Agriculture ("USDA"). (Sapilewski Decl. ¶¶ 8-9.) In early 2023, the property's owner and USDA learned that Millennia had transferred money out of the property without the owner's authorization, leading to further scrutiny by both USDA and HUD's Office of Multifamily Housing's Detroit regional office, which oversees properties in Michigan and Ohio. (*Id.*)

In May 2023, HUD informed Millennia and Sinito that it intended to conduct an on-site financial audit of Millennia properties within Michigan and Ohio. (*Id.* ¶ 10.) During a meeting to discuss that process, Sinito asked that HUD postpone or cancel the review; the HUD staff

member leading the review recalled Sinito "stated that everything would not be alright after we looked at the records." (*Id.* ¶ 11.) HUD nevertheless moved forward, while agreeing to limit the review to a sample of 24 properties owned by Sinito-affiliated entities. (*Id.*) This review, conducted at Millennia corporate headquarters in June 2023, covered the sixteen-month period from January 1, 2022, through April 30, 2023. (*Id.* ¶¶ 11-13.) Numerous suspicious distributions were identified during the review, including all but one of the distributions alleged in this action.[5] (*Id.* ¶ 13.) Further, HUD staff concluded that "there was no indication that this practice of wiring money to Mr. Sinito had stopped or slowed down. Instead, it seemed to be escalating in April of 2023." (*Id.* ¶ 14.) The review also determined that numerous Millennia properties had been underfunding their tenant security deposit accounts. (*Id.* Ex. A at HUD00015771.)

On the final day of the review, the HUD team met with Sinito and Millennia Chief Financial Officer John McGinty to discuss their findings. (Sapilewski Decl. ¶ 17.) Sinito did not deny the unauthorized distributions occurred. (*Id.*) Instead, he argued that outside circumstances had created financial difficulties for Millennia's business model. (*Id.*) He acknowledged that money had been withdrawn from property accounts, but he contended that these withdrawals were not paid to him personally—a statement that all other Respondents now acknowledge was not true. (*Compare id. with* Ex. 2 at No. 11.)

IV.    **HUD'S RESPONSE**

Following these revelations, HUD took several steps to protect FHA's interests in the Projects, as well as the interests of the Projects' tenants. Over the following months, HUD exchanged several rounds of correspondence with Millennia, via Sinito or the company's outside

---

[5] The exception is the violation alleged for the Robinson Heights property in Iowa, because it is not overseen by the Detroit region.

counsel. (Sapilewski Decl. ¶ 19; *see also id.* Exs. B-H.) During this exchange, HUD directed repayment of the security deposit deficiencies, and requested a certification from Sinito that he would no longer take unauthorized "advances" from properties subject to legal restrictions on distributions. (*Id.* Ex. D.) Sinito provided that certification on August 30, while acknowledging that he had continued taking advances long after the June review, as late as August 17. (*Id.* Ex. E.)

On November 28, the Office of Multifamily Housing in Detroit wrote letters to Sinito regarding the 15 Michigan and Ohio Projects involved in this matter. (SUMF ¶ 224; *see also* Sapilewski Decl. Ex. F.)[6] Each letter reminded Sinito of the findings from the June review and identified the unauthorized distributions that had been discovered. (*Id.*) It then directed Sinito to repay the total amount of those distributions by November 30, along with "any additional unauthorized distributions that were made subsequent to HUD's review," and provide evidence that he had made the repayment from funds that did not belong to any other property with HUD restrictions on distributions. (*See, e.g., id.* at HUD00000097.)

Sinito responded on November 30, stating that "The Millennia Companies is not able to comply by November 30, 2023, but does have a plan to address the findings." (Sapilewski Decl. Ex. G at HUD00000165.) Rather than dispute any of the allegations, he noted that he had been "transparent" regarding what HUD would find and had "tried to plan accordingly to correct all findings." (*Id.*) He also suggested that the distributions resulted from Millennia's acquisition of another company's HUD portfolio, some five years earlier. (*Id.*)

In December, Millennia's then-outside counsel provided evidence that it had repaid

---

[6] The sixteenth Project, Robinson Heights, is in Iowa, outside the responsibility of the Detroit office. HUD staff in Kansas City and a HUD contractor wrote to Respondents earlier in 2023 about repaying that Project's distributions. Respondents acknowledged the need for repayment, but none was ever made. (*See* SUMF ¶¶ 225-30.)

some, but not all, of the distributions cited in the November letters. (Sapilewski Decl. Ex. H.) Those repayments addressed deficiencies at only five of the sixteen properties at issue here and did not necessarily correspond to the amounts alleged. (*Id.*) No additional repayments have been made since that time. (Ex. 2 at No. 7.)

In parallel to the repayment discussions, HUD initiated a debarment proceeding against Millennia and Sinito, which resulted in their exclusion from all federal contracting for five years. (Iber Decl. ¶¶ 24-25.) On a case-by-case basis, HUD has granted exceptions to permit Millennia to renew HAP contracts and continue operating its existing HUD portfolio, provided that any unauthorized distributions from the project at issue are repaid. (*Id.* ¶ 26.) Millennia and its affiliates therefore continue to collect substantial funding from HUD. (*Id.* ¶ 16.) Millennia has earned approximately $160 million from HUD project-based HAP contracts in each of the last four years. (*Id.*)

## V.   PROCEDURAL HISTORY

In December 14, 2023, HUD served Respondents with Pre-Penalty Notices corresponding to each of the sixteen Projects involved in this matter, warning that HUD was considering imposing civil money penalties. (SUMF ¶ 231.) Under applicable regulations, Respondents had thirty days to respond and argue against the proposed penalties. 24 C.F.R. §§ 30.70, 30.75. If Respondents sought to assert an inability to pay the penalties, the regulations required that they "provide documentary evidence as part of [their] response." *Id.* § 30.75. Respondents did not respond.

HUD then filed the sixteen Complaints underlying this matter, from February through April of 2024. In total, these Complaints alleged that Respondents made 119 distributions that took $3,313,909 out of the Projects' accounts without authorization. HUD sought to impose, and now seeks, the then-maximum penalty of $59,316 per violation. On May 2, this Tribunal

consolidated these sixteen Complaints into a single action, and Respondents filed their initial

Answers on May 22. Respondents later sought and received permission to file amended answers

to add defenses based on Article III and the Seventh Amendment, which they did on August 1.[7]

On April 9, 2025, in return for limiting further discovery, Respondents agreed that they

would not offer evidence on any issue or penalty factor, other than ability to pay, and that they

would not contest any fact previously admitted in discovery in this action. (*See* Joint Stip. ¶¶ 5-

6.) Respondents retain their right to argue against any evidence or argument that HUD presents.

(*Id.* ¶ 7.)

This matter is currently set for hearing before this Tribunal, to commence on June 2,

2025.

## VI.    THE UNAUTHORIZED DISTRIBUTIONS

Discovery is now largely complete, and the material facts concerning the distributions are

either conceded or indisputable from the record. Respondents made 115 distributions from

Project funds, none of which fall into any of the permissible categories.[8] For 106 distributions,

the Entity Respondents[9] have admitted that the transfer was made from the Project; that it was

made without HUD's written approval; and that Millennia, acting as the authorized agent for the

mortgagor, initiated, directed, caused, or approved the transfer. The specific admissions

---

[7] Respondents initiated a parallel proceeding based on these arguments in the U.S. District Court for the Northern District of Ohio, seeking to enjoin this Tribunal's jurisdiction as unconstitutional. *See* U.S.D.C. Case No. 1:24-cv-02084. On April 28, 2025, the Court granted summary judgment in favor of HUD on all claims. *See id.* Dkt. 23.

[8] The sixteen Complaints in this action identified a total of 119 unlawful distributions. Following subsequent discovery and discussions between the parties, HUD has determined that it will no longer seek penalties for four of those transactions. (*See* SUMF ¶¶ 287a, 343a, 345a, 347a; Joint Stip. ¶ 9.)

[9] "Entity Respondents" means all Respondents except Frank Sinito. For most of HUD's discovery requests, the Entity Respondents and Sinito submitted separate responses and objections, with Sinito's limited to asserting his Fifth Amendment right against self-incrimination without providing any substantive answers.

applicable to each alleged transaction are set forth in the Statement of Undisputed Material Facts, paragraphs 237 through 355.

For eight distributions involving the two Oakdale Estates projects, the Projects' bank statements, internal business records, and interrogatory responses make clear that funds were removed from the applicable Project accounts on the dates alleged. (SUMF ¶¶ 325-33; Ex. 2 at Nos. 7, 11 (Request Nos. 142-150); Exs. 31, 33-34.) Respondents admitted that that each of these transfers was made without HUD's written approval, and that Millennia, acting as the authorized agent for the mortgagor, initiated, directed, caused, or approved the transfer. (SUMF ¶¶ 325d, 325f, 326d, 326f, 327e, 327g, 328e, 328g, 329d, 329f, 330d, 330f, 331c, 331e, 332c, 332e, 333e, 333g.)

The final alleged distribution consists of $30,000 paid out from the Robinson Heights project in 2022. Millennia previously acknowledged to HUD's audit contractor that this "represented an advance of funds to a related party" from Project funds, and that it should be repaid. (Ex. 40 at HUD00001095.) Entity Respondents have since explained that this advance consisted of "two separate transactions": a May 10, 2022 transfer of $10,000 and an October 6, 2022 transfer of $20,000, both paid to Sinito's bank account. (*See* Ex. 2 at No. 11 (Request 155).)[10] There is no evidence or suggestion that HUD ever approved these transactions.

In the case of 71 of these 115 transfers, Entity Respondents admit that Frank Sinito personally initiated, directed, caused, or approved the transfer. (SUMF ¶¶ 237i, 238h, 239h, 240h, 241h, 244i, 245i, 246i, 247g, 249g, 252g, 254g, 255h, 256h, 257h, 258g, 260g, 261g, 262g, 264g, 265g, 266g, 267g, 269g, 270h, 273g, 274h, 275h, 276g, 278f, 279g, 280g, 281g, 282g, 286h, 288g, 289g, 291g, 293h, 295f, 296g, 297g, 299f, 300g, 302f, 303g, 305g, 306g,

---

[10] Because the Complaint alleged only one violation, HUD seeks only one penalty for these two transactions.

307f, 310g, 319h, 325g, 326g, 327h, 328h, 329g, 330g, 332f, 333h, 334g, 336g, 340h, 342h, 348h, 349h, 350f, 351g, 352f, 353f, 354h, 355h.) At least 82 of the 115 transfers were recorded in the Project's internal records as a "GP Advance" being paid to the general partner entity (usually the "Investment LLC"); at least 71 of the "GP Advances" in fact went directly to Sinito's personal bank accounts. (SUMF ¶¶ 237-42, 244-47, 249, 252-57, 265-67, 269-70, 273-76, 279-83, 286, 288-89, 291-93, 296, 300, 301, 303-06, 308-12, 314, 317-20, 322-25, 327-30, 333, 334, 336-38, 340-42, 346, 348, 349, 351, 354-55.) The remainder were paid to Millennia or to other Sinito/Millennia affiliates. (SUMF ¶¶ 259-62, 264, 277, 297, 307, 313, 326,)

## **ARGUMENT**

This Tribunal's rules authorize a party to move for summary judgment on all or part of a claim. 24 C.F.R. §§ 26.32(*l*), 26.40(f). "Although Part 26 does not set forth a standard for the granting of a motion for summary judgment, the [Federal Rules of Civil Procedure] and case law interpreting the rules provide useful guidance." *In re Nationwide Home Loans, Inc.*, HUDOHA 23-AF-0071-MR-004, at 4 (June 7, 2023) (citing *In re Salvador Alvarez*, HUDALJ 04-25-PF, at 4 (June 23, 2005)). Federal Rule 56 states that summary judgment shall be granted if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To raise a "genuine" issue of fact, the "evidence [must be] such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Consequently, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

HUD is entitled to summary judgment on all 115 remaining counts. The factual record is essentially undisputed; Respondents have admitted nearly all the material facts, and the

remainder are well-documented, with Respondents unable to offer any evidence to the contrary. That record shows Respondents knowingly and materially committed 115 violations of the statutory prohibition on unauthorized distributions of project funds under 12 U.S.C. § 1735f-15(c)(1)(B)(ii). That record further shows that the nature of the violations and Respondents' course of conduct warrant the imposition of a maximum civil money penalty.

I.     **RESPONDENTS KNOWINGLY AND MATERIALLY VIOLATED THE STATUTE BY PAYING OUT MORE THAN $3 MILLION IN PROJECT FUNDS WITHOUT HUD AUTHORIZATION.**

A.  **HUD may impose penalties for unauthorized distributions of project funds by these Respondents.**

By statute, HUD is authorized to impose civil money penalties for knowing and material violations of 12 U.S.C. § 1735f-15(c)(1)(B), including when a party "pay[s] out any [project] funds, except for reasonable operating expenses and necessary repairs, without the prior written approval of the Secretary." 12 U.S.C. § 1735f-15(c)(1)(B)(ii); *see also* 24 C.F.R. § 30.45(c) (permitting civil money penalty actions for violations of 12 U.S.C. § 1735f-15(c)(1)(B)(ii)). Penalties for such violations may be imposed against: (a) any mortgagor of a property that includes 5 or more living units and that has a mortgage insured, coinsured, or held pursuant to the National Housing Act (12 U.S.C. § 1702 *et seq.*); (b) any general partner of a partnership mortgagor of such property; (c) any officer or director of a corporate mortgagor; (d) any agent employed to manage the property that has an identity of interest with the mortgagor, with the general partner of a partnership mortgagor, or with any officer or director of a corporate mortgagor of such property; or (e) any member of a limited liability company that is the mortgagor of such property or is the general partner of a limited partnership mortgagor. 12 U.S.C. § 1735f-15(c)(1)(A)(i)-(v); 24 C.F.R. § 30.45(c)(1)-(5).

An "agent employed to manage the property that has an identity of interest with the

13

mortgagor"—also called an "identity of interest agent"—refers to an entity that has "management responsibility for a project[,] in which the ownership entity, including its general partner or partners (if applicable) and its officers or directors (if applicable), has an ownership interest[,] and over which the ownership entity exerts effective control." 12 U.S.C. § 1735f-15(k). Under the corresponding HUD regulation, an "ownership interest" is defined broadly to include "any direct or indirect interest," including through a partnership or any "other medium of equity participation." 24 C.F.R. § 30.45(a)(5). "Effective control" means the "ability to direct, alter, supervise, or otherwise influence the actions, policies, decisions, duties, employment, or personnel of the management agent." *Id.* § 30.45(a)(2).

"Knowing" is defined as "having actual knowledge of or acting with deliberate ignorance of or reckless disregard for the prohibitions under [§ 1735f-15]." 12 U.S.C. § 1735f-15(h); *see also* 24 C.F.R. § 30.10. Neither statute nor regulation defines "deliberate ignorance or reckless disregard," but in such a case this Tribunal gives terms their ordinary meaning. *See In re Prime Venture Realty Assocs., LLC*, HUDALJ-10-F-003-CMP-1, at 16-17 (Mar. 31, 2011) (citing *Williams v. Taylor*, 529 U.S. 420, 431 (2000)); *see also In re Mirvice Babar,* HUDALJ 08-074-PF, at 24 (Apr. 27, 2009) (citing series of cases defining "deliberate ignorance" or "reckless disregard" to include "an extreme departure from ordinary care," "an extreme version of ordinary negligence," "willful blindness," and "failure to make simple inquiries."); *Ola Props. Inc. v. U.S. Dep't of Housing & Urban Dev.*, 336 F. App'x 419, 422 (5th Cir. 2009) (holding that under this standard, a mortgagor's "failure to familiarize himself with his obligations does not excuse his ability to meet them" and constituted, "at a minimum," reckless disregard).

"Material" is defined as "[h]aving the natural tendency or potential to influence, or when considering the totality of the circumstances, in some significant respect or to some significant

degree." *In re Apex Waukegan, LLC*, HUDALJ 22-AF-0129-CM-007, at 14 (Nov. 30, 2022) (quoting 24 C.F.R. § 30.10). In civil money penalty cases, materiality under the "totality of the circumstances" standard is determined by consideration of the factors identified at 24 C.F.R. § 30.80. *Id.*; *see also In the Matter of Assoc. Trust Fin. Servs.*, HUDALJ 96-008-CMP (Nov. 20, 1997); *Yetiv v. U.S. Dep't of Housing & Urban Dev.*, 503 F.3d 1087, 1090 (9th Cir. 2007). This Tribunal has stated that for summary judgment "[t]he record need not contain sufficient evidence to satisfy all the factors; a finding on one will support a finding of materiality." *Apex Waukegan, LLC*, HUDALJ 22-AF-0129-CM-007, at 14.

Each of these Respondents is a "liable party" subject to penalties for violations of the prohibition on distributions. As the SUMF and the chart in the Attachment to this Motion demonstrate, the Respondents here include:

- 16 mortgagors of a property that includes 5 or more living units and that has a mortgage insured pursuant to the National Housing Act, 12 U.S.C. § 1702 *et seq*.;

- 15 entities that are a general partner of a limited partnership mortgagor;

- Three entities that are a member of a limited liability company that is the mortgagor;

- Frank Sinito, who is a member of a limited liability company that is a general partner of a limited partnership mortgagor, with respect to 13 Projects; and

- Millennia, which is the identity-of-interest management agent for all 16 properties.

For three Projects, Frank Sinito does not appear to fall formally within the statutory definition of "liable parties" in the context of these unauthorized distributions, and the same is true for Respondent Oakdale Estates Investment GP, LLC. But using slightly different corporate forms for those Projects should not relieve Sinito of his personal responsibility to HUD and the corresponding Projects. Corporate structure can be used as a defense to liability only when the

proper formalities are in place and consistently respected; otherwise, the "fiction" imposed by corporate status "should be disregarded." *Bucyrus-Erie Co. v. Gen. Prods. Co.,* 643 F.2d 413, 418 (6th Cir. 1981). Under Ohio law, a court will consider the following factors in determining whether one party is the alter ego of another:

> (1) grossly inadequate capitalization, (2) failure to observe corporate formalities, (3) insolvency of the debtor corporation at the time the debt is incurred, (4) shareholders holding themselves out as personally liable for certain corporate obligations, (5) diversion of funds or other property of the company property for personal use, (6) absence of corporate records, and (7) the fact that the corporation was a mere facade for the operations of the dominant shareholder(s).

*Rutherlan Enters., Inc. v. Zettler Hardware*, 700 Fed. Appx. 398, 403 (6th Cir. 2017) (citing *Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 605 (6th Cir. 2005)).

The evidence illustrates that Oakdale Estates Investment GP, LLC, Halton Springs Investments, LLC, and Halton HR Investors, LLC—and likely every Respondent—is an alter ego of Frank Sinito. Sinito used each mortgagor's bank account as his own personal piggy bank, regularly transferring funds from one Millennia-run property to another (often using his personal account as an intermediary). (*See, e.g.,* SUMF ¶¶ 288a-88g ("GP Advance" from Hunter's Run paid to Sinito's personal account), ¶¶ 325a-25g (same, for Oakdale Estates).)[11] He was able to do so because he was the ultimate owner and controller of every mortgagor entity through a chain of shell companies. (SUMF ¶¶ 54-62, 88-107.) And at the center of his machinations was Millennia—the management agent for every property and therefore the entity with access to all bank accounts—which he also controlled. (SUMF ¶ 9.) Regardless of the formal organizational structure of a particular Project's ownership, he exercised exclusive power and control over each

---

[11] Indeed, Respondents have stated that, on dozens of occasions, a mortgagor "intended" to pay an advance to its general partner while in fact making the payment to Sinito personally. (*See generally* Ex. 2 at No. 11.) For most of the general partner Respondents, there is no evidence at all that they had a separate bank account or any independent financial existence of their own.

and every entity in the chain of ownership, with each serving as "a mere facade for the operations of the dominant shareholder." *Zettler Hardware*, 700 Fed. Appx. at 403.

Essentially, the two Oakdale Estates projects and Hunter's Run simply used an LLC as the mortgagor rather than the limited partnerships used at the other thirteen Projects, but they operated no differently. In the case of the Oakdale Estates projects, Sinito was the sole member of Oakdale Estates Investment GP, LLC, which was the general partner that controlled Oakdale Estates, Ltd., which was the sole member that controlled each of the Oakdale LLC mortgagors. (SUMF ¶¶ 89-94, 99-104.) For the Hunter's Run project, Sinito was the sole member of both Halton HR Investors, LLC and Halton Springs Investments, LLC, both of which are members of the mortgagor LLC. (SUMF ¶¶ 55-59.) The evidence shows a direct line of control between Sinito and the mortgagor LLCs. In truth, it would not matter how many redundant LLCs or limited partnerships Sinito placed between himself and the mortgagor; once the entities' corporate masks are removed, it always turns out to be Sinito underneath. Sinito should not be able to rely on illusory corporate forms to circumvent the statutory language and escape liability for his own wrongdoing.

### B. Respondents made 115 distributions of project funds without HUD approval.

The record demonstrates that not only did Respondents make the complained-of distributions, but that Respondents did not have, nor did they seek, approval for a single distribution.

Respondents' own admissions in their discovery responses conclusively establish liability and support the imposition of civil money penalties for all 115 distributions. Respondents admit that 106 of the 115 distributions occurred exactly in the amounts and on the dates that HUD alleges. (*Compare* Ex. 3 at Nos. 54-141, 150-54, 156-59, 161-63, *and* 165-72 *with id.* Nos. 142-

49, 155, 160, *and* 164.) The remaining nine violations are proven by the unrebutted documentary evidence, combined with other admissions by Respondents. (*See* Stmt. of Facts, Section **Error! Reference source not found.**VI, *supra*.) Respondents further admit that all 115 distributions were "initiated, directed, caused, or approved" either by the Project owner or by Millennia acting as their agent. (Ex. 3 at Nos. 54-154, 156-59, 161-63.) Respondents even admit that Frank Sinito personally "initiated, directed, caused, or approved" at least 71 of these transactions. (*Id.* at Nos. 54-58, 61-64, 66, 69, 71-75 77-79, 81-84, 86-87, 90-93, 95-99, 103, 105-06, 108, 110, 112-14, 116-17, 119-20, 122-24, 127, 136, 142-47, 149-51, 153, 157, 159, 165-72.)

Moreover, Respondents concede that none of the distributions were approved by HUD, as required by the statute, as well as by HUD regulations and the Regulatory Agreements. (*Id.* at Nos. 54-154, 156-59, 161-63, and 165-72.) Mr. Sinito himself acknowledged in an August 30, 2023 letter to HUD—submitted months before these Complaints were even filed—that Respondents had engaged in unauthorized transactions. (*See* Sapilewski Decl. Ex. E.) Respondents' admissions and the irrefutable evidence establish that they knowingly made all 115 distributions without HUD approval and are therefore liable as a matter of law.

But even if Respondents *could* contest the occurrence or impropriety of these distributions—which they cannot—the evidence in the record further verifies HUD's allegations. Respondents recorded at least 82 of the 115 distributions in their internal financial records as a "GP Advance." (SUMF ¶¶ 237-42, 244-47, 249, 252-57, 259-67, 269-70, 273-77, 279-83, 286, 288-89, 291, 293, 296, 297, 300, 303-13, 317-20, 322-30, 333, 334, 336-37, 340-42, 346, 348, 349, 351, 354-55.) Additionally, Respondents affirmatively state that the majority of the distributions (at least 75 out of the 115) simply transferred funds from a Project's operating account to *Frank Sinito's personal bank account.* (*See* SUMF ¶¶ 237-38, 240-42, 244-47, 249,

252-57, 265-67, 269-70, 273-76, 279-83, 286, 288-89, 291, 293, 296, 300-01, 303-06, 308-12, 314, 317-20, 322-25, 327-30, 333-34, 336-38, 340-42, 346, 348-49, 351, 354-55.) Sinito's internal accounting ledgers confirm that, at best, each transfer was used to pay obligations incurred by other Millennia-affiliated properties—such as mortgage payments or payroll shortages—*not* expenses of the transferring property. (*See, e.g.,* Ex. 54 at 4 ("St. Antoine – fund Century Woods and Heather Ridge mortgages"); Ex. 56 at 10 ("Morning Star - GP ADV – to fund 12/30 payroll, Sunset Empire draw, Brockington int, Century CRBT extension, ptsp distribution o/d - REPAY FROM WILTON").) For example, Cherry Estates LP transferred $40,000 out of the Cherry Estates property's operating account to Frank Sinito's personal account on February 3, 2022. (SUMF ¶¶ 237a-37b.) According to Sinito's ledger, this transfer was for the purpose of "fund Uniontown extension and APB payroll"—two expenses that had nothing to do with Cherry Estates. (*Id.* ¶ 237d.) Some transfers even seem to have been used to pay off partner-investors at other properties, such as a July 21, 2022 transfer from the Morning Star Towers project. (*Compare* SUMF ¶ 308d (general ledger entry including "Lexington Fedeli check" and "Greenhaven Silver & Small redemptions") *with* Ex. 53 at 12 (showing general ledger entries on same date for the "LP Interest Transfers" account, described as "fund purchase of Umberto Fedeli's interest in Lexington Village OH, LLC," "Steven Small - Purchase 6.0704% LP Interest," and "Eric Silver - Purchase 6.0704% LP Interest").)

Respondents have not produced a scintilla of evidence that any of these distributions were made to cover reasonable operating expenses of the originating Project, or else that they were drawn from surplus cash on the prescribed schedule. Despite claiming to engage outside auditors "when required" to calculate surplus cash and to rely on those calculations when making distributions (Ex. 2 at No. 6), Respondents' admissions and the record show that none of the

distributions were drawn from surplus cash. (*See* Ex. 3 at Nos. 54-59, 61-159, 161-63, 165-72.) Indeed, most projects never had surplus cash from which to draw, and the few that did were generally distributing much higher amounts than supportable by their own cash calculations. (*See, e.g.,* SUMF ¶¶ 157, 171.) Moreover, surplus cash can generally only be calculated at the end of a semiannual or annual fiscal period—not on an ad hoc, as-desired basis to justify transfers. (*See* SUMF ¶¶ 7, 19, 29, 37, 45, 53, 62, 71, 79, 87, 97, 107, 115, 124, 132, 140, 149; Iber Decl. ¶ 10.) Nor can these distributions be justified as "reasonable operating expenses." The relevant Regulatory Agreements define such expenses as those "that arise from the operation, maintenance and routine repair of the Project and that *primarily benefit the Project (as opposed to Borrower)*[.]" (*See, e.g.,* Ex. 25 at ¶ 1(bb) (emphasis added).) Advances to affiliated entities, whether used to pay a mortgage, avoid payroll shortfalls, or cover unpaid property taxes, do not meet this definition. For the transactions not explicitly identified as advances, Respondents do not bother to identify an alternative purpose or justification, nor could they credibly do so, given that 75 transactions went to Sinito's personal bank account and the remainder went to accounts of his or Millennia's affiliates.[12] Shuffling money between or among Sinito and each of his investment properties cannot be described as "expenses that arise from the operation, maintenance and routine repair of the Project[.]" Each of the 115 distributions was therefore not

---

[12] For all but 11 of the remaining transactions, an interrogatory response or Sinito's general ledger entries indicate the recipient of the transferred funds. For the remaining 11, the record does not clearly establish a recipient. (*See* SUMF ¶¶ 243, 248, 271-72, 290, 294, 315-16, 335, 339, 344.) However, each of those 11 instances corresponds to a year in which the paying Project's auditors found, and Respondents admitted, that the Project made unauthorized distributions in an amount that exceeds the total alleged amount in the respective Complaint. (*See* SUMF ¶¶ 155, 169, 175, 177, 185, 187, 197, 205, 211.)

For example, auditors found that, in 2022, Flushing Elmcrest Limited Dividend Housing Association Limited Partnership used $395,953 of operating funds for purposes unrelated to the Project in violation of HUD's restrictions on unauthorized distributions, while the Complaint alleges only $160,025 in unauthorized distributions. (*See* SUMF ¶ 161.). It is reasonable to infer that each transaction alleged in this matter contributed to the overall amount found by that year's audit.

authorized by HUD statute, regulation, or agreement.

### C.  Respondents knowingly violated HUD requirements.

Respondents indisputably knew of the prohibitions that they violated. As discussed *supra,* Respondents voluntarily entered into HUD programs and executed contracts that clearly delineated the conditions under which distributions of project funds could lawfully be made, consistent with the statute under which HUD has brought this case, as well as accompanying regulations. (*See* Section II.A, *supra*.) Respondents cannot credibly claim ignorance of those restrictions. *See, e.g., Ola Props.*, 336 F. App'x at 422 (finding reckless disregard, and thus a knowing violation, by mortgagor when the regulatory agreement, regulations, and a HUD handbook all put him on notice of statutory requirement); *see also Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 63-64 (1984) (participant in a government program had "a duty to familiarize itself with the legal requirements" of that program, under "the general rule that those who deal with the Government are expected to know the law"). But in addition to Respondents' direct knowledge of project-specific regulations, all but two Respondent entities are owned and controlled by Frank Sinito, and therefore his knowledge and actions are imputed to them. *See In re Omnicare, Inc. Secs. Litig.,* 769 F.3d 455, 475 (6th Cir. 2014) ("Knowledge of a corporate officer or agent acting within the scope of [his] authority is attributable to the corporation." (citing *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.,* 399 F.3d 651, 688 (6th Cir. 2005)) (internal quotations omitted)); Restatement (Third) of Agency § 5.03 (2006) ("[N]otice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal[.]"); *id.* § 5.03 cmt.(d)(7) ("[T]he relevant personal knowledge is that of the individual who took the action that the statute [prohibits], or, in appropriate circumstances, the personal knowledge of the individual who directed or ratified the

action taken."); *see also Raymond-Eldredge Co. v. Sec. Realty Inv. Co.*, 91 F.2d 168, 172 (6th Cir. 1937) (Where "a dominant individual who owns substantially all the beneficial interest[s] creates several corporations and vests in them the legal title to his property[,]" a court "will look through the form of the legal entities . . . and impute his knowledge to all his corporations.")

Sinito and Millennia have ownership interests in over two hundred HUD-insured or HUD-assisted multifamily properties (SUMF ¶ 10), and they publicize their experience with HUD and the housing industry generally. Millennia's website states that the company "owns/operates more than 280 apartment developments in 26 states, housing more than 86,000 people and employing more than 1,100." Home - The Millennia Companies, https://themilleniacompanies.com/ (last visited Apr. 28, 2025). Sinito's website biography asserts that, "[s]ince founding The Millennia Companies® in 1995, Sinito expanded its portfolio of apartment developments to include more than 275 multifamily residential communities in 26 states, many of which have undergone transformative rehabilitations. These efforts have resulted in thousands of housing opportunities for families of all income levels." Frank T. Sinito – The Millennia Companies, https://themilleniacompanies.com/frank-t-sinito/ (last visited Apr. 28, 2025).

In addition to Sinito, key Millennia officers are touted as experts in the housing industry. For example, John McGinty, Millennia's Chief Financial Officer, is described as having "over 30 years of experience in the affordable and market-rate housing industry." John W. McGinty – The Millennia Companies, https://themilleniacompanies.com/johnmcginty/ (last visited Apr. 28, 2025). Lori Iacona, Millennia's Vice President of Compliance Operations, is described as "providing leadership to the department staff to ensure maximum compliance for all HUD, LIHTC, and RD regulatory agreements; support[ing] property management teams with access to

HUD systems; and coordinat[ing] data and reports." Lori Iacona – The Millennia Companies, https://themillenniacompanies.com/lorilacona/ (last visited Apr. 28, 2025). And Millennia acted as the management agent for each Project, on behalf of each owner-Respondent, in which capacity it admittedly initiated, directed, caused, or approved each transfer. (SUMF ¶ 10; Ex. 3 at Nos. 54-154, 156-59, 161-63.) Given the level of expertise among Millennia's leadership, Respondents cannot plausibly argue that they were unaware of HUD's regulations, Respondents' obligations thereunder, or their implications for Respondents' business as a whole.

Moreover, Respondents were on clear notice—through their own auditors—that their practice of making unauthorized distributions violated HUD requirements. For example, the 2021 audit of Covenant Apartments Limited Partnership found that the partnership made $75,000 in unauthorized distributions that year. (Ex. 61 at HUD00038142-43.) The auditor recommended that management "immediately reimburse the project's cash account," and attributed the violation to a lack of procedures ensuring that distributions were limited to available surplus cash, as required by HUD regulations. (*Id*.) John McGinty, on behalf of the partnership, concurred with the auditor's findings, stating: "Management is aware of the requirements related to the use of Project funds and all amounts are expected to be repaid to the Partnership by June 30, 2022. Furthermore, internal controls over disbursement of Project funds are being strengthened to prevent future noncompliance." (*Id*.) Sinito himself electronically signed the AFS on June 21, 2022 (*id*. at HUD00038145), yet 87 of the violations here occurred after this date. Similar findings were made across Millennia's portfolio in 2021, including at five other properties that are subjects of this litigation:

- Evergreen Estates: $112,521 in unauthorized distributions (Ex. 65 at HUD00038523-24.)

- Hunter's Run Apartments: $51,013 in unauthorized distributions (Ex. 80 at HUD00038718-19.)

- Morning Star Tower: $924,258 in unauthorized distributions (Ex. 71 at HUD00038255-57.)

- Sherman-Thompson Towers: $30,000 in unauthorized distributions (Ex. 74 at HUD00038591-92.)

- St. Antoine Gardens: $50,000 in unauthorized distributions (Ex. 91 at HUD00038660-61.)

Given these repeated findings, admissions, and (empty) promises to implement corrective measures, all before the bulk of the distributions in this case were made, it would not be credible for Respondents to now claim ignorance of HUD's restrictions on unauthorized distributions.

Importantly, this is not the first time Millennia or Sinito has been cited by HUD for making unauthorized transfers in violation of the very prohibition at issue here. On June 22, 2021, HUD's Departmental Enforcement Center ("DEC") issued a letter to Sinito, demanding that he cease and desist unauthorized distributions he had been making from another similarly-insured property, Cedar Woods, since at least 2019. (SUMF ¶ 150.) On June 13, 2023, Sinito and Millennia, the project's management agent, executed a settlement agreement with HUD, wherein Respondents admitted to making unauthorized distributions from Cedar Woods in each fiscal year from 2019 through 2022, in violation of 12 U.S.C. § 1735f-15 and the project's regulatory agreement. (Ex. 60 at HUD00014633-41.) Notably, some of these pre-2023 distributions were labeled as "an advance to the general partner," (*id*. at HUD00014635), akin to the numerous "GP Advance" entries in this case. The parties amended that agreement on October 24, 2023, after Respondents admitted to making yet more unauthorized distributions from Cedar Woods in fiscal

24

year 2023, in violation of 12 U.S.C. § 1735f-15 and the corresponding regulatory agreement. (*Id.* at HUD00014627-31.)

In any event, the sheer volume of unauthorized distributions precludes any reasonable inference of mistake. Each of the 16 properties at issue participated in this distribution scheme—and fifteen properties transferred some amount of funds explicitly described as a "GP Advance." The conduct was systemic, coordinated, and repeated—not isolated or accidental.

The overwhelming evidence in the record establishes that Respondents knowingly violated 12 U.S.C. § 1735f-15(c)(1)(B)(ii) when they made each of the 115 transfers at issue.

**D.  Respondents' violations of HUD requirements were material.**

Respondents' violations were material because they had the "tendency or potential to influence" HUD's decision-making. They are significant under any standard. These violations are equally material when viewed through the lens of the 24 C.F.R. § 30.80 factors to assess "the totality of the circumstances."

First, HUD's restrictions on unauthorized distributions allow HUD to safeguard the financial viability of FHA-insured properties and, by extension, the FHA insurance fund. (Iber Decl. ¶ 12.) Respondents' practice of depleting project resources by making unauthorized distributions from project funds materially harmed the financial position of the properties. (*Id.* ¶¶ 12, 20.) Properties in weakened financial condition are at increased risk of a mortgage default—and that default puts the FHA insurance fund at risk for a substantial loss. (*Id.*) If HUD had been aware that each of the Respondent entities would bring significantly more risk to the FHA insurance fund by making these distributions, it would never have insured the Projects' mortgages in the first place. (*Id.* ¶ 22.)

Second, reducing the amount of funds in a property's operating account impairs the

property's ability to fund needed maintenance and operating expenses. (*Id.* ¶¶ 9, 11, 12, 20.) If a property cannot afford its maintenance or operating expenses, the property's residents are directly harmed because they are forced to reside in hazardous or otherwise deficient residences. (*Id.* ¶¶ 12, 20.) Deferring or delaying maintenance at a property due to a lack of funds could also lead to a decline in the property's value, thereby increasing the risk to the FHA insurance fund. (*Id.* ¶¶ 12, 20-21.) In the event of a default, the diminished value of the collateral exposes the insurance fund to a greater potential loss. (*Id.* ¶¶ 21-22.) An inability to satisfy expenses could also lead to legal action from third parties, which places an additional burden on a project's finances and management. Indeed, certain of Respondents are already embroiled in litigation over their inability or failure to pay expenses. *See, e.g.,* Compl. at 2-3, 16, 21, in *Maco Pest Control LLC v. Millennia Hous. Mgmt., Ltd.*, Case No. CV 25 110677 (Cuyahoga Cnty. Ct. Com. Pl. filed Jan. 22, 2025) (alleging that Millennia failed to pay money owed for pest control services at certain properties, including International Towers and Kingsbury Tower).[13]

Third, HUD necessarily relies on accurate financial reporting from mortgagors. These unauthorized distributions, however, resulted in the submission to HUD of inaccurate monthly accounting reports ("MARS"). (Iber Decl. ¶ 21.) Properties are generally required to submit MARS when there are indicators that the project is experiencing financial or management difficulties, to allow HUD to proactively evaluate the property's performance and monitor compliance. (*Id.*) With inaccurate or falsified data, HUD is unable to adequately assess a property's level of risk and take the necessary actions to protect its interests. (*Id.*) For example, HUD's assessment of a property's risk determines how HUD assigns Account Executives to

---

[13] A copy of this complaint with its exhibits is attached as Exhibit 99. Page numbers correspond to pages in the PDF file.

oversee the property and the level of review that will be applied. (*Id.*) HUD cannot do so appropriately without accurate financial information. (*Id.*) As a result, HUD may lose the opportunity to take necessary, timely actions to protect its interests in the property and the interests of residents for which HUD provides assistance. (*Id.*)

Because Respondents' unauthorized distributions substantially impact HUD programs, HUD's interests in insured properties, and tenants' interests in safe, affordable housing, Respondents' wrongful conduct is material. Indeed, if HUD knew prior to its dealings with Respondents what it knows now, it might have rejected the applications for mortgage insurance altogether. (*Id.* ¶ 22.) At the very least, HUD would have significantly altered the terms to strengthen the protections for its investments. (*Id.*)

Further damning evidence of materiality is what HUD has done since learning of Respondents' pervasive wrongdoing: HUD has debarred Millennia and Sinito, excluding them from engaging in any procurement or nonprocurement transactions with the federal government. (Iber Decl. ¶¶ 23-25.) HUD has done so even though debarring Millennia and Sinito has generally increased the resources HUD must put toward managing Millennia's properties in the near term, including additional scrutiny concerning the renewal of HAP contracts and other means of federal assistance. (*Id.* ¶ 26.) While HUD works to maintain some existing relationships with Millennia properties to avoid collateral harm to residents, the debarment sends a strong signal that HUD deems this conduct unacceptable and disqualifying for Respondents' ability to obtain new opportunities.

The evidence in the record compels a finding that Respondents' repeated violations of the statute were material because such violations had "the natural tendency or potential to influence"; HUD would not have insured the mortgages on the terms it did, and it will not work

with Respondents again for at least five years. The violations harmed HUD's programs to a

significant degree. And, as demonstrated in Section II *infra,* when considering the totality of the

circumstances as defined by the factors listed in 24 C.F.R. § 30.80, the evidence compels the

conclusion that Respondents' violations were material.

## II.     WHEN ONE OF THE COUNTRY'S LARGEST PROVIDERS OF AFFORDABLE HOUSING ROUTINELY FLOUTS HUD'S RULES TO UNLAWFULLY REMOVE MORE THAN $3 MILLION FROM PROJECT FUNDS, THE PENALTY SHOULD BE SUBSTANTIAL.

Respondents' repeated, deliberate, and egregious violations of their statutory obligations

justify a significant penalty commensurate with the magnitude of the offense. At the time it filed

the Complaints, HUD was permitted to impose a civil money penalty of up to $59,316 for each

violation of the statute. *See* 12 U.S.C. § 1735f-15(c)(2); 28 U.S.C. § 2461 note (providing for

inflation adjustments to civil money penalties); 24 C.F.R. § 30.45(g); 88 Fed. Reg. 9745 (Feb.

15, 2023) (annual inflation adjustment). In determining the amount of civil money penalties to

seek, HUD must take into consideration the factors set forth at 12 U.S.C. § 1735f-15(d)(3) and

24 C.F.R. § 30.80. This Tribunal has recognized that not every factor will apply directly to every

charge, and the maximum penalty can be supported by even a single compelling factor. *See Apex*

*Waukegan, LLC*, HUDALJ 22-AF-0129-CM-007, at 16 (Nov. 30, 2022).

Having considered these factors, as applied to the facts of this case, HUD seeks to impose

the maximum penalty for each violation alleged here. The undisputed facts demonstrate that each

factor applies, and those factors counsel in favor of substantial penalties. Weighing most heavily,

however, are the gravity of the offenses, the culpability of Respondents, the benefits received

from these violations, and the need to deter future violations.

### A.  The Gravity of the Offense

The violations here are significant by any measure: Respondents engaged in 115

indisputably unlawful transactions to improperly remove at least $3,111,525 from 16 Projects subject to FHA-insured mortgages. They did so repeatedly, without seeking permission from—or even notifying—HUD, even though the transactions directly reduced the value of the collateral that secured HUD's interest in the mortgages. Further, they did so *after* being told to stop by HUD and by their auditor. These unauthorized transactions increased the risk of default, and thus the risk to the FHA insurance fund, by causing less money to be available to pay the mortgage, taxes, and other bills, as well as to fund maintenance, repairs, and capital improvements to the insured properties. (Iber Decl. ¶¶ 12, 20); *see also In re Broadway Tower Apt. Assocs. et al.*, HUDALJ No. 05-015-PF at 6, 2005 WL 5490944 (Jan. 28, 2005).

While HUD is not (yet) aware of any default involving these 16 Projects' FHA-insured mortgages during the period in which these transactions occurred, a default is not necessary to show that the Projects' financial condition was harmed. It remains possible, of course, that these transactions will directly or indirectly lead to a default in the future. But Respondents' impairment of the mortgage collateral has already increased the risk to HUD's mortgage insurance program, constituting "a particularly grave violation of the trust bestowed upon [Respondents] by HUD . . . ." *See, e.g., In re Mantua Gardens East, Inc.*, HUDALJ 12-F-043-CMP-3 at 16, 2013 WL 663168 (Feb. 1, 2013) (imposing a maximum penalty for encumbering project assets as collateral for a new loan, even without removing funds from the project).

### B.  The Degree of the Violator's Culpability

Respondents are highly culpable for their wrongdoing. There is no doubt that Respondents, through their common principal Frank Sinito and their common management agent Millennia, had actual knowledge of the prohibition at issue, knew that their actions would violate it, and yet deliberately took those actions more than 100 times. Importantly, while this case seeks

penalties for 115 undisputed and unlawful transactions, that list derives from just 16 properties over a 16-month period. But Millennia and its affiliates control dozens of properties with FHA-insured mortgages, and have done so for many years, so these transactions are only a fraction of the potentially actionable violations.

Indeed, an examination of Sinito's personal general ledgers demonstrates that, for any given entry that corresponds to a violation alleged as part of this case, there are sometimes *dozens* of nearly identical entries that have not been alleged here. For example, on March 23, 2023, Sinito engaged in 50 transactions identified as "Distributions" that are each labeled with the name of a different Millennia-managed project and the description "GP Advance - fund 3/24 payroll and Musicians Towers RE Taxes." (Ex. 57 at 6-7.) But only six of those transactions were identified in HUD's review of Michigan and Ohio projects and included in this case. Some or all of the remaining 44 transactions also reflect distributions from projects with FHA-insured mortgages, but they simply fell outside the geographic scope of the initial investigation and therefore have not been included in this case.

As discussed above, Respondents indisputably had knowledge of the prohibition at issue. For one thing, any participant in a government program has "a duty to familiarize itself with the legal requirements" of that program, under "the general rule that those who deal with the Government are expected to know the law." *Heckler*, 467 U.S. at 63-64. That expectation rings especially true here, where Respondents are components of a sophisticated business enterprise that receives approximately $160 million in HUD funds each year. (Iber Decl. ¶¶ 4-5, 13, 16.) The relevant statutory provision requires no detailed interpretation to comprehend or comply with its terms; it straightforwardly bars "paying out any funds, except for reasonable operating expenses and necessary repairs, without the prior written approval of the Secretary." Were that

30

not enough, each of these Projects was also subject to a Regulatory Agreement that reiterated and elaborated on this restriction. (SUMF ¶¶ 17-19, 28-29, 36-37, 44-45, 52-53, 61-62, 70-71, 78-79, 86-87, 96-97, 106-07, 114-15, 122-24,131-32, 139-40, 147-49.)

But even if Respondents had somehow missed all those provisions, Sinito was personally notified of them by HUD's Departmental Enforcement Center in June of 2021, in reference to another of his properties with an FHA-insured mortgage. (*Id.* ¶ 150.) That letter identified unauthorized distributions from the Cedar Woods property and reminded Sinito that "distributions, the payment of non-Project expenses, the repayment of related party advances, and/or the loaning of Project funds must be supported by surplus cash or other entity cash as of the end of a semiannual or annual fiscal period, within the limitations described in your business agreements with HUD." (Ex. 59.) The letter further noted that "[a]ny future unauthorized use of Project funds will be required to be repaid to the Project," and that such transactions "may result in HUD pursuing civil money penalties and taking further enforcement action against the Owner and others responsible for the operations of the Project." (*Id.*)[14]

Each transfer at issue in this case occurred between January 2022 and April 2023—at least six months after this warning. "[T]he fact that Respondents continued to take such disbursements in the years following" the discovery and reprimand of an unauthorized distribution "indicates a high degree of culpability and knowledge." *Broadway Tower*, HUDALJ No. 05-015-PF at 7 (after being required to repay an unauthorized distribution in 2001, "Respondents were clearly on notice" and culpable for further distributions they made in 2002 and 2003).

---

[14] HUD later uncovered additional distributions from Cedar Woods, after which the DEC reached a settlement with Millennia and two other Sinito affiliates to repay the distributions and pay a civil money penalty. Sinito himself personally signed the settlement agreement. (*See* SUMF ¶¶ 150-52; Ex. 60 at HUD00014640-41.)

Despite being on notice that these types of transfers were unlawful, and that HUD would enforce the prohibition, Sinito and his affiliates continued to violate it. While Respondents have at times offered explanations or excuses for their conduct, the statute does not contemplate any exceptions. And any hypothetical excuse, for example, that the pattern of distributions was unavoidable, withers when faced with the facts that Respondents never notified HUD, sought its approval, or even asked for its forgiveness. Respondents made $3,111,525 worth of unauthorized distributions and simply hoped that they would never get caught.

### C. Benefits Received by the Violators and Others

Respondents—particularly Frank Sinito—received a direct benefit of the $3,111,525 in distributions that he and his affiliates unlawfully extracted from these FHA-insured properties. To the extent that money was not simply retained by Sinito, it appears to have been paid to other persons, including other Sinito-affiliated properties and their ownership entities; Sinito's business partners; and creditors of Sinito and his affiliates, all of which accrued to Sinito's benefit.

Many of the Projects lacked sufficient surplus cash to make any distributions at all (*see* Exs. 61-93 (each property's financial statements showing surplus cash levels)), but even those that might have been financially sound still failed to adhere to the HUD-required process of making distributions only after an annual or semiannual calculation of surplus cash. Respondents have not contended (and certainly not produced any evidence) that any Project's surplus-cash position allowed it to make any distribution at issue here, which means that none of the transferred funds would have gone to Sinito in the absence of these violations.[15]

---

[15] For each distribution, HUD requested that Respondents admit that it was not made from the Project's surplus cash. In each instance, Respondents did not admit or deny the request but instead contended that to respond would

While Respondents have not produced documents or other evidence sufficient to trace every misappropriated dollar, the available evidence indicates that most or all of the distributions were made to Sinito or to entities controlled by him, at the direction of either Sinito personally or a Millennia senior manager working closely with him. (*See* Section I.B, *supra*.) The funds were then diverted to purposes unrelated to the Project from which they came. (*Id.*) The evidence suggests that the proceeds of many of these transactions went to fund expenses of other properties in the Sinito/Millennia portfolio, including mortgage payments and payments to general contractors, and to fund payroll for other Sinito affiliates. (*Id.*) Other transactions provided funds for Sinito to buy out the ownership interests of his business partners or investors, allowing him to consolidate his ownership over certain properties. (*Id.*) All these payments indirectly benefited those lenders, creditors, and partners. But they primarily benefited Sinito, by satisfying debts that he otherwise would have had to pay from his own assets and by increasing his equity stake in certain properties.

To the extent that Respondents have not produced evidence of the final destinations of some portion of these proceeds, the Tribunal can infer that those funds were used for the personal benefit of Sinito or another Respondent. *See Mantua Gardens East,* HUDALJ 12-F-043-CMP-3 at 17 ("Respondent Grier sought Fifth Amendment protection rather than disclose what became of the proceeds from this loan. The Court therefore infers that he has repurposed those funds for his own benefit. This warrants a maximum penalty."). Here, the Entity Respondents have acknowledged that more than 70 of the transfers were made directly to Sinito, even when internal financial documents indicated they would be paid to the mortgagor's general

---

"require[ them] to re-create the entity's books and records at the time the transfer occurred, and this information is not readily obtainable to enable them to admit or deny." (*See generally* Ex. 3 at Nos. 54-172.) Respondents have not amended these answers.

partner entity; others indisputably went to Sinito-owned or -affiliated entities. [16]

Meanwhile, Sinito invoked the Fifth Amendment to refuse to answer Requests for Admission and Interrogatories intended to find out further destinations and uses of those funds. (*See* Exs. 97-98.) James Wells, Executive Vice President for Millennia, similarly invoked the Fifth Amendment to refuse to answer questions about the ultimate destination of each transfer. (Ex. 95 at 54-100.) John McGinty, Millennia's Chief Financial Officer, invoked the Fifth Amendment as well, refusing to provide information about the transfers. (Ex. 96 at 46:20-58:18.) When a non-party witness closely identified with a party refuses to testify, that refusal may be admitted against the party and permits the drawing of adverse inferences. *See LiButti v. United States*, 107 F.3d 110, 123-24 (2d Cir. 1997).

That Respondents repaid less than half of the total amount of wrongful distributions, at 5 of the 16 Projects (*see* Ex. 2 at No. 7)*,* does not mitigate this element or any other, particularly when Respondents took this halfhearted step only after HUD threatened enforcement action. HUD demanded Respondents take this step months during months of discussions with no success before it initiated these enforcement actions. (Sapilewski Decl. Exs. F-G.) And while some distributions have been repaid, most have not. (Ex. 2 at No. 7.) The Entity Respondents asserted in an interrogatory response that they have repaid more than $1.5 million, though the distributions cited as corresponding to those repayments total only $1,368,700. (*Id.*) Either figure, of course, falls well short of the $3,111,525 in total distributions at issue here. And even *that* amount was repaid only during a brief period following HUD's November 2023 letters

---

[16] As described above, many distributions were labeled in internal documentation with notations along the lines of "GP Advance," and directed to be paid to the Project's general partner entity, typically "[Project Name] Investment, LLC." Regardless of the formally intended recipient, however, most of the distributions were in fact direct transfers to bank accounts owned by Sinito. (*See* SUMF ¶¶ 237-42, 244-47, 249, 252-57, 265-67, 269-70, 273-76, 279-83, 286, 288-89, 291-93, 296, 300-01, 303-06, 308-12, 314, 317-20, 322-25, 327-30, 333-34, 336-38, 340-42, 346, 348-49, 351, 354-55.)

requiring the immediate repayment of specific amounts and warning of potential enforcement actions. (*Id.* (noting that repayments were not made until December 2023).) Respondents have since made no repayments to any of these Projects in 2024 or 2025. (*Id.*) They have made no repayments at all for 11 of the 16 Projects. (*Id.*) Moreover, as discussed above, the widespread pattern of commingling and shuffling reflected in Respondents' ledgers far exceeds the number of distributions described in the Complaints. (Exs. 51-58; *see also* Exs. 61-93 (Respondents' auditors concluded that from 2021 through 2023, Respondents made *at least* $5,504,527 in unauthorized distributions at these 16 properties alone).)

### D. Deterrence of Future Violations

Respondents' conduct here amply illustrates that only a substantial penalty can provide deterrence sufficient to protect HUD's interests. "The penalties assessed must be greater than the benefits enjoyed from non-compliance with the law; otherwise mortgagors may be tempted to believe that it 'pays' to violate the law, and the penalties will have no deterrent value." *In re Yetiv*, HUDALJ 02-001-CMP at 17, 2003 WL 25961324, at *11 (Sept. 2, 2003). "The sheer brazenness of Respondents' scheme also strongly supports a sizeable penalty as a means to deter other would-be violators." *Mantua Gardens East,* HUDALJ 12-F-043-CMP-3 at 27.

As described above, the transactions at issue here were intentional, in knowing violation of the statute, without notice to HUD, and undertaken with the hope that they would never be discovered. Respondents knew that HUD could not monitor every financial transaction made by its business partners, and they knew that HUD must largely trust its partners to comply with their statutory, regulatory, and contractual obligations. Respondents' transactions were blatantly laid out in Respondents' bank statements and bookkeeping documents, which they knew that HUD would not routinely scrutinize. Respondents' wrongdoing here came to light only because

35

Millennia got caught pilfering funds from a different HUD-assisted (but not FHA-insured) property that it managed, apparently in the mistaken belief that Sinito owned it. (Sapilewski Decl. ¶ 9.) Once prompted to take a closer look at its own Millennia-managed and Sinito-owned portfolio, HUD swiftly discovered the dozens of transactions at issue here. (*Id.* ¶¶ 11-13.)

Mortgagors know that HUD cannot reasonably detect every instance of wrongdoing and cannot always dedicate enforcement resources to penalizing them. Some might use this to their advantage, taking a calculated risk to extract funds from a project, whether for personal gain or to forestall some other financial calamity with more immediately harmful consequences to the mortgagor's principals. That risk calculation naturally includes an estimate of potential penalties for an unauthorized distribution. As a result, "[t]he penalty imposed on these Respondents should dissuade others from making such an attempt." *Mantua Gardens East,* HUDALJ 12-F-043-CMP-3 at 27.

It follows that mere disgorgement of the ill-gotten gains by repaying the respective Project accounts, without more, would *not* provide an effective deterrent. Repayment only restores the *status quo ante*, providing essentially no disincentive for a mortgagor planning to "borrow" project funds for some other purpose, keep them unless and until HUD notices and acts, and then claiming "no harm, no foul" once repaid. Only a substantial penalty, irrespective of any repayments, will discourage project owners from using project funds as a zero-interest piggy bank. In any event, as noted above, Respondents have repaid less than half of the money they unlawfully took, and only in the face of imminent enforcement action.

Deterrence must be communicated particularly strongly given the status of Respondents and the nature of the offense. Millennia and its affiliates constitute one of the nation's largest owners and operators of multifamily housing, including HUD-assisted housing. (SUMF ¶¶ 8,

10.) Because of their prominence, these cases and related proceedings have received substantial media coverage and, undoubtedly, the attention of other companies in the industry. (Iber Decl. ¶ 5.) The conduct here was brazen and repeated, reflecting what appeared to be a routine business practice. Further, Respondents have not suggested that they made these transfers by mistake, or that they misinterpreted some gray area of the law. Respondents are, in fact, parts of a large, sophisticated enterprise operating hundreds of residential and commercial properties, with experienced administrative and compliance staff supporting its portfolio. (*See* Section I.C, *supra* (discussing Millennia, Sinito, John McGinty, and Lori Iacona's web bios).) If a company with the size and scope of Respondents is not held accountable for purposely ignoring HUD requirements and protocols, smaller enterprises will surely argue for even more lenient treatment.

The penalty must also deter Respondents themselves from future wrongdoing. As noted elsewhere, the transactions at issue in this case are but a snapshot of a sample: HUD staff reviewed a fraction of Millennia's FHA-insured portfolio, looking at just 16 months of financial and accounting documents for those projects. (Sapilewski Decl. ¶¶ 11, 14.) But this indisputably falls far short of encompassing the full universe of unlawful transfers; Millennia has admitted to numerous similar transactions beyond those alleged here. (*See, e.g.,* Sapilewski Decl. Ex. E at HUD00000484, HUD00000490-91 (acknowledging distributions after April 30, 2023, in violation of applicable restrictions, from more than forty properties in Michigan and Ohio alone).) General ledgers suggest that similar violations occurred on a massive scale across the Millennia portfolio. (*See, e.g.,* Section II.B, *supra* (identifying fifty identically labeled transactions on March 23, 2023, of which only six are charged as violations here).) Other pending court proceedings, entirely unrelated to this action or these properties, have asserted the same. *See, e.g,* Complaint ¶ 20, *RIK IOF Millennia Buck Portfolio, LLC et al. v. Brandegee*

*Garden NY, LLC et al.*, Case No. 1:25-cv-00561-SO (N.D. Ohio, filed Mar. 21, 2025) (alleging, among other things, that investors in six Millennia properties not involved in this matter "have discovered at least 12 unauthorized disbursements of funds to Sinito himself and various entities affiliated with Sinito and Millennia . . . in a total amount exceeding $750,000 over at least the last four years").[17]

At present, HUD does not know whether Respondents have actually stopped this practice. But even assuming they are not *currently* engaged in these unlawful actions, there is every reason to expect them to resume after the present proceedings unless they fear significant penalties from doing so.[18]

### E.  Injury to Tenants and to the Public

"In considering the factor of injury to the public, an assessment of the harm caused to the integrity of HUD's programs and the costs of enforcement and litigation should be made." *In re Premier Invs. I, Inc.*, HUDALJ 06-022-CMP, 2007 WL 7305630, at *5 (June 29, 2007). "The public is injured if the Government has to expend funds to keep the project in good repair and operating appropriately, to ascertain the extent of the unauthorized disbursements or lack of funds for the project, or if the mortgagor defaults and the Government must pay an insurance claim on the mortgage." *Broadway Tower,* HUDALJ No. 05-015-PF at 6-7. Even if a default has not yet occurred, HUD—and, therefore, the public—has nevertheless suffered an injury from conduct that increases the *risk* of default. *Id.*

---

[17] Attached hereto as Exhibit 100.

[18] Respondents' Amended Answers contend that severe penalties "would not further deter Millennia as HUD's aggressive pursuit of these penalties has forced Millennia to divest from much of its HUD properties." (*See, e.g.,* Cherry Estates Am. Ans. at p. 11.) To date, however, Millennia and its affiliates continue to own or manage the vast majority of the HUD-related properties that they owned or managed before this action began. (Iber Decl. ¶ 14.) Respondents' misleading and self-serving statement should receive zero credence in the analysis.

Further, Respondents' utter disregard for these program requirements has required HUD to expend considerable resources pursuing compliance and enforcement, which also constitutes an injury to the public. *HUD v. Crestwood Terrace Partnership*, HUDALJ 00-002-CMP at 7 (Jan. 30, 2001). In the Office of Multifamily Housing, staff members at both the regional and headquarters levels considered whether and how to assess whether unauthorized distributions were occurring across the portfolio, then assigned four staff members to travel and spend three full working days in Millennia's Cleveland offices to review financial records for a sample of properties in just two states. (Sapilewski Decl. ¶¶ 22-23; Iber Decl. ¶ 28.) Staff then met and corresponded with Sinito and Millennia seeking further information and demanding repayment of the misappropriated funds. (Sapilewski Decl. ¶¶ 24-25; Iber Decl. ¶ 28.) Because the problem appeared to be pervasive, HUD staff in both Multifamily Housing and the DEC gathered documents and reviewed files related to other Millennia properties nationwide to determine if other instances of unauthorized distributions could be identified. (Iber Decl. ¶ 29.) Given the amount of money potentially at issue and the significance of the Respondents in the industry, these reviews were routinely discussed with HUD senior executive staff at the highest levels of the agency. (*Id.* ¶ 32.)

After this process resulted in no repayments pertaining to these 16 Projects, the agency initiated this enforcement action, which has required attorneys from the Office of Program Enforcement ("OPE") to invest substantial time in reviewing the files, preparing 16 Pre-Penalty Notices and 16 Complaints, and litigating these cases, including by reviewing thousands of documents for production to Respondents, as well as drafting numerous motions, discovery requests and responses, and other papers. (*Id.* ¶ 30.) Counsel, in turn, has required additional staff time from the Office of Multifamily Housing to provide assistance and subject-matter

expertise to the litigation. (Sapilewski Decl. ¶ 26; Iber Decl. ¶ 31.)

OPE and the DEC also had to prepare, review, and finalize materials related to the debarment. (*Id.* ¶ 30.) And now, following the debarment, Multifamily Housing staff must undertake additional steps to evaluate potential waivers and impose conditions to permit Millennia-related entities to renew their HUD contracts, or else risk forcing HUD-assisted tenants out of their homes. (*Id.* ¶ 26.)

### F.  History of Prior Offenses

This Tribunal has stated that only "adjudicated" offenses qualify in determining a respondent's offense history. *In re Lord Commons Apartments, LLC*, HUDALJ 05-060-CMP at 8 (July 20, 2007). But this Tribunal has also, in a case similar to this one, taken note of a respondent's recidivism following an earlier repayment of unauthorized distributions at the behest of the DEC. *Broadway Towers,* HUDALJ No. 05-015-PF at 7. In any event, "there is no impediment to imposing the maximum penalty for some or all violations, even in the absence of prior offenses." *In re Sundial Care Center, Inc.*, HUDALJ 08-055-CMP at 19 n.22 (Mar. 25, 2009).

HUD is not presently aware of any *adjudicated* violations involving Respondents. However, Respondent Millennia was a party to the June 2023 settlement agreement with the DEC, in which it admitted to violations essentially identical to those at issue here, involving the Cedar Woods project. Millennia, along with that project's owner entity and the owner's managing general partner, acknowledged unauthorized distributions from project funds in each fiscal year from 2019 through 2022. (Ex. 60 at HUD00014633-41.) The settlement agreement—signed by Frank Sinito on behalf of each of the three entities—identified more than $736,000 in unauthorized distributions, which had been repaid to the project before the settlement; the

40

entities also agreed to pay a $20,000 civil penalty. (*Id.*) Several months later, the parties amended the settlement agreement to reflect an additional $116,000 in unauthorized distributions in 2023, which were also repaid along with a further $10,000 penalty. (*Id.* at HUD00014627-31.)

HUD submits that this incident reflects a consistent attitude of lawlessness across Respondents' corporate family and by Sinito personally. Even if the Tribunal determines that the negotiated resolution for the Cedar Woods unauthorized distributions cannot formally constitute a history of prior offenses, the underlying facts of that case nevertheless amplify Respondents' culpability and the need for deterrence, among other factors weighing in favor of imposing the maximum penalty.

### G. Ability to Pay

Under 24 C.F.R. § 30.80(c), a respondent's ability to pay the penalty "shall be presumed unless specifically raised as an affirmative defense or mitigating factor by the respondent." If a respondent seeks to raise its inability to pay, it "shall provide documentary evidence as part of its response" to HUD's Pre-Penalty Notice. 24 C.F.R. § 30.75(b). Here, Respondents provided no documentary evidence in response to the Pre-Penalty Notice, and no Answer or Amended Answer has specifically raised the inability to pay as an affirmative defense or mitigating factor. Respondents' ability to pay must therefore be presumed.

Regardless, there is ample evidence that Respondents collectively have sufficient assets to pay any penalty imposed here. Sinito and his companies hold interests in hundreds of properties across the country, including more than 30,000 multifamily residential units along with commercial ventures like the Key Tower, the 57-story tallest building in Ohio that houses Millennia's headquarters. (*See* Jessica Dill, *Feds raid house of Key Tower owner*, Fox8 News, https://fox8.com/news/feds-raid-house-of-key-tower-owner/.; Sapilewski Decl. ¶ 4; Iber Decl. ¶¶

4, 13.) From HUD's project-based rental assistance program alone, Millennia and its affiliates have earned more than $160 million in each of the past four years, totaling more than $650 million. (*Id.* ¶ 16.)

To the extent any given Respondent entity proves to be undercapitalized or insolvent, that should bear no weight for two reasons. First, liability here is joint and several. *See generally* 12 U.S.C. § 1735f-15(c)(1)(A) (defining "liable parties" without apportioning liability). Second, it would be inequitable to assess ability to pay on an entity-by-entity basis when Respondents themselves have ignored their separate corporate identities when it suited their purposes, as the nature of the violations themselves demonstrates, and as further supported by Respondents' misleading or at least sloppy bookkeeping. (*See* SUMF ¶¶ 237-42, 244-47, 249, 252-57, 265-67, 269-70, 273-76, 279-283, 286, 288-89, 291-93, 296, 300-01, 303-06, 308-12, 314, 317-20, 322-25, 327-30, 333-34, 336-38, 340-42, 346, 348-49, 351, 354-55 (showing that at least 71 advances purportedly paid to general partner *entities* in fact went directly to Sinito's personal account); *see also* Section I.A, *supra* (discussing that all Respondents operate as alter egos of Sinito and vice versa).)

Respondents have waived any argument against the presumption that they have the ability to pay the penalties sought. But even if they had not, it strains credulity that the substantial assets and income of Sinito and Millennia would be unable to satisfy any penalty this Tribunal can impose for these violations.

## **CONCLUSION**

At bottom, Respondents' practices here resemble nothing so much as a Ponzi scheme, with funds being shuffled from one participant to another to stay just ahead of creditors' demands. Unlike a traditional "rob Peter to pay Paul" framework, however, the scheme at issue

here seemed to involve raiding one Millennia property to pay the debts of another, effectively commingling assets of legally separate project entities into a single slush fund for the ultimate benefit of Frank Sinito. But Respondents chose to finance these Projects through FHA-insured mortgages, reaping the benefits of that program in exchange for accepting HUD's requirements that aimed to ensure the continued viability, solvency, and housing quality of the properties. Because Respondents routinely and repeatedly ignored those requirements, even after being specifically told to stop, HUD respectfully submits that this Tribunal should impose the maximum penalty for each of the 115 unauthorized and unlawful transactions that have been established by the undisputed evidence.

Date: April 28, 2025

Respectfully Submitted,

*/s/ Noah R. Mink*
Noah R. Mink, Esq.
Jennifer M. Grim, Esq.
Shahrzad Nikoo, Esq.
Brandon W. McCune, Esq.
*Government Counsel*
U.S. Department of Housing and
Urban Development
Office of Program Enforcement
451 7th St. SW, Room 10245
Washington, DC 20410
Office: 202-402-5099
Email: noah.r.mink@hud.gov
jennifer.m.grim@hud.gov
shahrzad.nikoo@hud.gov
brandon.w.mccune@hud.gov

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 28th day of April, 2025, the foregoing document was served on the

following parties in the manner indicated:

**VIA EMAIL AND SHAREPOINT**
Marisa T. Darden
Alayna K. Bridgett
Bianca N.C. Smith
Johanes Maliza
127 Public Square, Suite 4900
Cleveland, OH 44114
mdarden@beneschlaw.com
abridgett@beneschlaw.com
bsmith@beneschlaw.com
JMaliza@beneschlaw.com
*Counsel for Respondents*

**VIA EMAIL AND SHAREPOINT**
Tammie M. Parshall, Paralegal Specialist
HUD Office of General Counsel
Office of Program Enforcement
451 7th St. SW, Room 10245
Washington, DC 20410
tammie.m.parshall@hud.gov

<u>*/s/ Noah R. Mink*</u>
Noah R. Mink, Esq.